IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| AMERICAN MOTORISTS INSURANCE COMPANY, ) | CIVIL NO. 10-00199 SOM/KSC |
| ) | |
| Plaintiff, ) | ORDER DENYING OCD, LLC'S MOTION FOR SUMMARY JUDGMENT |
| ) | |
| vs. ) | |
| ) | |
| THE CLUB AT HOKULI`A, INC., a ) Hawaii nonprofit corporation; ) HOKULI`A COMMUNITY ) ASSOCIATION, INC., a Hawaii ) nonprofit corporation; 1250 ) OCEANSIDE PARTNERS, a Hawaii ) limited partnership; TEXTRON ) FINANCIAL CORPORATION, a ) Delaware corporation; RED ) HILL 1250, INC., a Washington ) corporation; and OCD, LLC, a ) Hawaii limited liability ) company, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| | |
| OCD, LLC, a Hawaii limited ) liability company, ) | |
| ) | |
| Cross-claimant, ) | |
| ) | |
| vs. ) | |
| ) | |
| 1200 OCEANSIDE PARTNERS, a ) Hawaii limited partnership, ) | |
| ) | |
| Cross-defendants ) | |
| _____ ) | |

<u>ORDER DENYING OCD, LLC'S MOTION FOR SUMMARY JUDGEMENT</u>

I.        <u>INTRODUCTION.</u>

Plaintiff American Motorists Insurance Company ("AMICO") is a surety on various performance bonds relating to a luxury residential development on the Big Island of Hawaii.  When the bonds' principal, Defendant 1250 Oceanside Partners ("Oceanside"), allegedly defaulted on its development obligations, the bonds' obligees, The Club at Hokuli`a, Inc. ("The Club") and Hokuli`a Community Association ("HCA"), made a demand on AMICO.  This lawsuit followed.  Besides suing Oceanside, The Club, and HCA, AMICO sues Defendant Textron Financial Corporation ("Textron"), another bond obligee; a former Oceanside general partner, OCD, LLC ("OCD"); and a present Oceanside general partner, Red Hill 1250, Inc. ("Red Hill"). OCD now moves for summary judgment with respect to all of AMICO's claims against it.  Those claims are for breach of indemnity agreements, specific performance, <u>quia timet</u>, and declaratory relief.

OCD argues that: (1) OCD cannot be held jointly and severally liable by AMICO for Oceanside's breach of its indemnification agreements with AMICO because OCD was no longer an Oceanside partner when Oceanside's obligation to indemnify AMICO accrued; (2) AMICO's claims against OCD are time-barred; and (3) OCD's obligation to AMICO under the indemnification

agreements was discharged because, after OCD's dissociation from Oceanside, AMICO materially altered OCD's obligation to AMICO. Given material factual disputes, the court denies OCD's motion.

II.      FACTUAL AND PROCEDURAL BACKGROUND.

     A.   General Background.

Around 1990, Oceanside bought 1,550 acres of land on the Big Island of Hawaii for a luxury residential community development to be named "Hokuli`a." Aff. Stephen Beatty ¶ 6, ECF No. 210-1. Oceanside planned to develop various recreational amenities for Hokuli`a homeowners, including a golf course, golf maintenance facility, clubhouse, beach activity center, and tennis courts. Id. at ¶ 8. Oceanside formed and organized HCA as Hokuli`a's homeowners' association, and formed and organized The Club to administer and manage Hokuli`a's golf club. Id. at ¶ 7.

In 1999 and 2001, Oceanside agreed to build facilities and improvements at Hokuli`a for The Club and HCA. See Decl. Phil Edlund Supp. The Club & HCA's Mot. Partial Summ. J. ("Edlund Decl.") Ex. A ("Club Improvements Agreement"), ECF No. 203-2; Edlund Decl. Ex. B ("Amended Club Improvements Agreement"), ECF No. 203-3; Edlund Decl. Ex. E ("Phase I Agreement"), ECF No. 203-6; Edlund Decl. Ex. G ("Phase II Agreement"), ECF No. 203-8. Oceanside also contracted with the County of Hawaii to develop

and construct improvements related to Hokuli`a.  See Pls. Second Amended Compl. ¶ 22, ECF No. 144 ("Complaint").

> B.   Oceanside Partnership.

Oceanside is a limited liability partnership registered in Hawaii.  See Declaration of Rex Y. Fujichaku ("Fujichaku Decl.") Ex. 14, ECF No. 446-16 ("Oceanside Formation Agreement"). Oceanside's founding general partners were Ocean Club Development Company ("OCDC") and Red Hill.  Id.  OCDC and Red Hill established Oceanside in April 1990 for the sole purpose of developing the Hokuli'a project.  See id. at 5.

In December 1999, OCDC assigned all of its partnership interests in Oceanside to OCD.  See Fujichaku Decl. Ex. 20, ECF No. 446-22.   On May 22, 2002, OCD sold its partnership shares to Red Hill.  See Declaration of Masato Hasegawa at ¶ 4, ECF No. 357-1.

> C.   Surety Bonds.

The original and Amended Club Improvements Agreements, the Phase I Agreement, and the Phase II Agreement (collectively, the "Development Agreements") each required Oceanside to execute a surety bond in favor of The Club or HCA.  See Club Improvements Agreement at 3; Amended Club Improvements Agreement at 4; Phase I Agreement at 3; Phase II Agreement at 2.  In addition, Oceanside executed bonds in favor of the County for the contracted development and construction.  See Complaint at ¶ 23.  From 1999

to 2001, AMICO issued nine bonds ("the Bonds"), with penal sums totaling $118,846,694.00.  See Declaration of Steve Squatrito ("Squatrito Decl.") Exs. 1a-1h, ECF No. 446-2.  The Bonds issued in favor of The Club and HCA required Oceanside to complete construction by specific dates and bound AMICO to pay stated sums if Oceanside did not satisfy its obligations.  See Squatrito Decl. Ex. 1g, ECF No. 446-2 ("Phase I Bond"); Squatrito Decl. Ex. 1h, ECF No. 446-2 ("Club Improvements Bond"); Squatrito Decl. Ex. 1i, ECF No. 446-2 ("Phase II Bond").

>        D.    Dual Obligee Riders.

On August 29, 2001, by way of separate bond riders, Deere Credit Inc. ("Deere"), one of Oceanside's lenders, was added as a dual obligee to the Amended Club Improvements Bond, the Phase I Bond, and the Phase II Bond.  See Squatrito Decl. Exs. 6a-c, ECF No. 446-7.  In 2005, Deere was deleted as a dual obligee from the three Bonds.  See Squatrito Decl. Exs. 7a-c, ECF No. 446-8.  On June 27, 2006, Textron, another of Oceanside's lenders, was added as a dual obligee on all nine Bonds.  See Squatrito Decl. Exs. 8a-i, ECF No. 446-9.

>        E.    Indemnity Agreements.

When AMICO issued the Bonds, Oceanside and its general partners entered into two written agreements in which they agreed to indemnify AMICO with respect to any losses AMICO might incur as surety.  One of the agreements was entered into in 1999, one

in 2001.  <u>See</u> Squatrito Decl. Ex. 2, at 1, ECF No. 446-3 ("1999 Indemnity Agreement"); Squatrito Decl. Ex. 3, at 2, ECF No. 446-4 ("2001 Indemnity Agreement").  Whether OCD is liable under either indemnity agreement is the subject of this motion.

Oceanside entered into the 1999 Indemnity Agreement on September 13, 1999.  <u>See</u> 1999 Indemnity Agreement.  Oceanside's general partners at the time (OCDC, Inc., and Red Hill) signed the agreement.  <u>Id.</u>  In relevant part, the 1999 Indemnity Agreement provides:

> The Indemnitors will indemnify and save the Company [AMICO] harmless from and against every claim, demand, liability, cost, charge, suit, judgment, attorneys' fees and expense which the Company may pay or incur by reason of having executed or procured the execution of, such bonds, or any renewals or continuations thereof or substitutes thereof, or by reason of the failure of the Indemnitors to perform or comply with any of the covenants or conditions of this Agreement, in making any investigation on account thereof, in prosecuting or defending any action which may be brought in connection with any bond, in obtaining a release from liability and enforcing any of the agreements herein contained.

OCD, while not an Oceanside general partner in September 1999, acquired all of OCDC's interests in Oceanside in December 1999.

Oceanside and AMICO entered into the 2001 Indemnity Agreement on June 12, 2001, after OCDC had assigned its interests to OCD.  <u>See</u> 2001 Indemnity Agreement.  The 2001 Indemnity Agreement provides in relevant part:

> Indemnitors agree to indemnify and hold
> harmless Surety immediately upon remand for
> any and all Loss sustained or incurred by
> reason of having executed any and all Bonds.
> The Indemnitors [sic] obligation to indemnify
> the Surety shall also apply to any Bond
> renewals, continuations or substitutes
> therefore.

2001 Indemnity Agreement at 2, ¶ 1.  In the agreement, "Bonds"

refers to any bonds issued prior or subsequent to June 12, 2001.

Id. at 1.

> F.   Alleged Default on the Bond Obligations.

AMICO says that some of the bonded work was not

completed by the completion dates delineated in the Bonds.  See,

e.g, Fujichaku Decl. Ex. 16, at 183:24 - 184:21 ("De Fries

Depo."). On March 3, 2010, The Club and HCA notified Oceanside

that it was in default on the Development Agreements, and

Oceanside acknowledged that it was unable to complete

performance.  See Squatrito Decl. Ex. 10, ECF No. 446-11.  The

Club and HCA then demanded that AMICO perform its obligations

under the Bonds.  Id.  Two weeks later, on March 18, 2011, AMICO

sent Oceanside a written demand for indemnity under the 1999 and

2001 indemnity agreements.  See Squatrito Decl. Ex. 12, ECF No.

446-13.  Oceanside did not comply.  See Squatrito Decl. at ¶ 46.

AMICO filed this lawsuit on April 5, 2010, and filed

its Seconded Amended Complaint on May 11, 2011.  AMICO seeks,

among other things, to hold Oceanside, OCD, and Red Hill jointly

and severally liable for breaching the 1999 and 2001

7

indemnification agreements.   OCD now moves for summary judgment
on AMICO's claims.

III.      <u>EVIDENTIARY OBJECTIONS.</u>

        Both AMICO and OCD have also filed evidentiary
objections.   AMICO objects to many of the factual assertions in
OCD's Concise Statement of Material Facts.   <u>See</u> Pls. Objections
to Defs. Separate Concise Statement of Material Facts in Supp. of
its Mot. for Summary Judgment, ECF No. 445 ("AMICO Objections").

        The court relies on only one fact challenged by AMICO:
that Textron was added to the Bonds as a dual obligee on June 27,
2006.   <u>See</u> AMICO Objections at 3.   OCD has submitted copies of
the dual obligee riders, which are dated June 27, 2006.   <u>See</u>
Declaration of Cheryl A. Nakamura ("Nakamura Decl.") Ex. X, ECF
No. 357-26.   While AMICO argues that the court cannot consider
the exhibits because they are allegedly not properly
authenticated as required by Rule 56 of the Federal Rules of
Civil Procedure, AMICO does not identify any manner in which the
riders have been altered or otherwise rendered different from
their original state.   In any event, as the court is denying
OCD's motion, AMICO is not prejudiced by the court's
consideration of the date Textron became a dual obligee.

        For its part, OCD objects to the exhibits that AMICO
attaches to the Declaration of Rex Y. Fujichaku and to portions
of the Declaration of Steve Squatrito.   <u>See</u> Defs. Evidentiary

8

Objections and Request to Strike the Exs. to the Fujichaku
Declaration Including the September 9, 2011 Expert Report of
Thomas Ueno and to Strike Portions of the Squatrito Decl., ECF.
No. 455 ("OCD Objections").  The court need not rule on OCD's
objections to the text of the Squatrito Declaration, as the court
does not here rely on the challenged statements in the Squatrito
Declaration.  The court relies only on some of the exhibits
attached to the Squatrito Declaration.  OCD complains that
Squatrito's purported authentication of the exhibits is not based
on actual knowledge of that authenticity.  Id. at 9.  Instead,
OCD says, Squatrito can only attest that the exhibits are true
and correct copies of documents in AMICO's files, or, in some
cases, true and correct copies of documents produced by a third
party during discovery.  See, e.g., id. at 12,16.  To the extent
exhibits are authenticated by others, Squatrito's authentication
is superfluous.  Exhibit 5 to Squatrito's Declaration is
apparently not authenticated by others.  It consists of invoices,
purportedly from AMICO to Oceanside.  See Squatrito Decl. Ex. 5,
ECF No. 446-6.  OCD does not claim that the documents are
fabricated or manipulated, even though the documents appear to be
items that OCD would have been in a position to recognize as
inauthentic.  Given that circumstance, the court overrules the
objection to Exhibit 5.  To the extent OCD is challenging Exhibit
4 to Squatrito's Declaration on the same ground, the court's
ruling is the same as for Exhibit 5.

9

To the extent OCD objects to exhibits attached to the Fujichaku Declaration that the court does not rely on, the court need not address those objections.  Of the challenged Fujichaku exhibits, the court relies on Exhibits 14, 16, 20, and 22.  Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

OCD objects to Exhibits 14 and 20 on the ground that they are attached to the deposition of Masato Hasegawa, excerpts of which, attached as Exhibit 15 to AMICO's Concise Statement, do not include Hasegawa's oath or affirmation or that of the interpreter who translated Hasegawa's testimony from Japanese into English.  See OCD Objections at 24.  Exhibit 14 is a copy of Oceanside's Amended and Restated Limited Partnership Agreement, and Exhibit 20 is a copy of the Oceanside Assignment of Partnership Interests, purportedly signed by OCD.  See Fujichaku Decl. at ¶¶ 4, 10.  The court overrules OCD's objections.  Even if AMICO should have included the oaths in its deposition excerpts, the court finds no prejudice to OCD.  In particular, the court notes that, as Exhibit 14 appears to have been signed by OCD's predecessor, and Exhibit 20 appears to have been signed by OCD itself, OCD could easily have determined whether the documents were indeed what they appear to be.  OCD identifies no specific alteration to either document rendering it an inaccurate

copy and offers no evidence that either document was not actually signed.

Exhibit 16 is a copy of excerpts from the transcript of the deposition of John De Fries.  <u>See</u> Fujichaku Decl. at ¶ 6. OCD objects to the exhibit on the grounds that it (1) lacks an oath or affirmation by De Fries, (2) neither indicates that De Fries has personal knowledge of the matters testified to nor otherwise establishes a foundation for his testimony, (3) contains speculative testimony, and (4) contains hearsay and lacks testimony establishing that De Fries is an Oceanside employee, or stating what his position was, or whether he has personal knowledge of the matters testified to.  <u>See</u> OCD Objections at 25.

While the exhibit indeed lacks explicit statements establishing that it is sworn testimony or indicating De Fries's position at Oceanside, the court overrules OCD's objections. First, the exhibit states that it is a deposition, and the Fujichaku declaration states that Exhibit 16 is a true and correct copy of the transcript of the De Fries deposition.  <u>See</u> Fujichaku Decl. Ex 16, ECF No. 446-18 ("De Fries Depo."); Fujichaku Decl. at ¶ 6.  As a deposition is by definition given under oath, the court is satisfied that De Fries's statements were made under oath.  Second, the deposition testimony itself establishes that De Fries has personal knowledge of the matters that the court relies on.  AMICO cites the deposition to

11

establish facts regarding the progress of the Phase I developments.  See Opposition at 31-32.  De Fries testifies that he was an HCA board member when Oceanside was supposed to have completed the Phase I work in issue.  See De Fries Depo. at 169:15-17.  As an HCA board member, De Fries would have known about the Phase I work, as it was the subject of contracts between HCA and Oceanside.  See Phase I Agreement at 1.  Notably, OCD does not actually dispute that De Fries was Oceanside's general manager.  Opposition at 31.  Third, the court overrules OCD's generalized hearsay and speculation objections, which appear to assume a lack of personal knowledge.

Exhibit 22 is a copy of excerpts from the transcript of the deposition of William Siwek.  See Fujichaku Decl. at ¶ 12. OCD argues that Exhibit 22 does not establish what position Siwek holds at what company, and whether he has personal knowledge of the matters testified to.  See OCD Objections at 28-29.  OCD objects to Exhibit 22 on the same grounds that it objects to Exhibit 16; the court overrules those objections for the same reasons.  First, a true and correct copy of a deposition is assumed to contain sworn testimony.  See Fujichaku Decl. at ¶ 12. Second, Siwek's testimony indicates his personal knowledge of the matters testified to.  Siwek testifies about the addition of Textron as a dual obligee.  He refers to the party that entered into a contract with Textron as "we," suggesting his own involvement.  See, e.g., Fujichaku Decl. Ex. 22 ("Siwek Depo."),

at ¶ 49:12-25, ECF No. 446-24.  His admission that he does not

know what happened "post me leaving" suggests that he was

refraining from speculating.  <u>Id.</u> at 58:17.  OCD does not

actually deny that Siwek was the CFO of Red Hill (an Oceanside

general partner).

 In summary, the court overrules OCD's objections to

Exhibits 14, 16, 20, and 22.

IV. <u>STANDARD.</u>

 Rule 56 of the Federal Rules of Civil Procedure permits

a party to move for summary judgment on all or some claims or

defenses.  Fed. R. Civ. P. 56(a).  Summary judgment shall be

granted when "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(a).  A moving party has

both the initial burden of production and the ultimate burden of

persuasion on a motion for summary judgment.  <u>Nissan Fire &</u>

<u>Marine Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102 (9th Cir.

2000).

 The burden initially falls on the moving party to

identify for the court "the portions of the materials on file

that it believes demonstrate the absence of any genuine issue of

material fact."  <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors</u>

<u>Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987) (citing <u>Celotex Corp.</u>

<u>Catrett</u>, 477 U.S. 317, 323 (1986)); <u>accord</u> <u>Miller v. Glenn Miller</u>

<u>Prods., Inc.</u>, 454 F.3d 975, 987 (9th Cir. 2006).  "A fact is

material if it could affect the outcome of the suit under the governing substantive law." Miller, 454 F.3d at 987.  When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were uncontroverted at trial.  Id. (quoting C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc., 213 F.3d 474, 480 (9th Cir. 2000)).  By contrast, when the nonmoving party bears the burden of proof on one or more issues at trial, the party moving for summary judgment may satisfy its burden with respect to those issues by pointing out to the court an absence of evidence from the nonmoving party.  Miller, 454 F.3d at 987.

When the moving party meets its initial burden on a summary judgment motion, "[t]he burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial."  Id.  The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial.  See Balint v. Carson City, Nev., 180 F.3d 1047, 1054 (9th Cir. 1999).  On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor."  Miller, 454 F.3d at 988 (brackets omitted) (quoting Hunt v. Cromartie, 526 U.S. 541, 552 (1999)).

V.          ANALYSIS.

OCD identifies three reasons it is entitled to summary judgment.  First, OCD claims that it cannot be jointly and severally liable under the indemnification agreements because Oceanside's obligation to indemnify AMICO did not accrue until after OCD's dissociation from Oceanside.  Second, OCD argues that AMICO's breach of contract claim is time-barred.  Third, OCD argues that, even if Oceanside's indemnification obligation accrued before OCD's dissociation, AMICO voided OCD's obligation by agreeing to material alterations of the Bonds after OCD's dissociation.  The court rejects all three of OCD's arguments.

> A.   There are Genuine Issues of Material Fact Regarding Whether Oceanside's Alleged Liability Under the Indemnity Agreements Accrued While OCD was an Oceanside General Partner.
>
> 1.   When it Became a General Partner, OCD Assumed Personal Liability Under the Indemnity Agreements.

As Oceanside is a Hawaii limited partnership, Hawaii partnership law governs the obligations of the Oceanside partnership and its partners.  Hawaii has adopted the Uniform Limited Partnership Act.  See HRS § 425E-101 ("This chapter may be cited as the "Uniform Limited Partnership Act.").

OCD first argues that it is not bound by the indemnity agreements as a separate entity because it was not a party to the agreements.  OCD points out that it did not sign the 1999 Indemnity Agreement, as it was not yet an Oceanside partner, and

that it signed the 2001 Indemnity Agreement on behalf of Oceanside, not on its own behalf.  Nevertheless, as an Oceanside general partner, OCD was, by law, jointly and severally liable for all of Oceanside's obligations.

Under section 425E-404 of Hawaii Revised Statutes, "all general partners are liable jointly and severally for all obligations of the limited partnership unless otherwise agreed by the claimant or provided by law."  Neither AMICO nor OCD disputes that Oceanside's duty to indemnify AMICO is an obligation of the Oceanside partnership.  Under section 425E-404, because OCD was a general partner when Oceanside entered into the 2001 Indemnity Agreement, there can be no dispute that OCD could be held jointly and severally liable at least for the period it was a general partner.

With regard to the 1999 Indemnity Agreement, OCD appears to argue that, because it was not a partner when Oceanside executed the agreement, it cannot be liable under that agreement.  Indeed, under section 425E-404, "[a] person that becomes a general partner of an existing limited partnership shall not be personally liable for an obligation of a limited partnership incurred before the person became a general partner."  However, when OCD became an Oceanside general partner, it stepped into OCDC's shoes.  See Fireman's Fund Ins. Co. v. AIG Hawaii Ins. Co., Inc., 109 Hawaii 343, 349 (2006) ("An assignment operates to place the assignee in the shoes of the assignor.")

(citations omitted).   OCDC assigned all of its partnership

rights, title, and interest in Oceanside to OCD.   See Fujichaku

Decl. Ex. 20, ECF No. 446-22.   When OCD stepped into OCDC's shoes

through the assignment, OCD inherited not only OCDC's partnership

interests, but also OCDC's joint and several liability under the

1999 Indemnity Agreement.

> 2.    There are Genuine Issues of Material Fact as
>        to Whether Oceanside's Obligation Under the
>        Indemnity Agreement Accrued Before OCD's
>        Dissociation.

A dissociated general partner's liability for the debts

of its former partnership is governed by section 425E-607 of

Hawaii Revised Statutes, which states in relevant part:

> (a) A person's dissociation as a general
> partner shall not of itself discharge the
> person's liability as a general partner for
> an obligation of the limited partnership
> incurred before dissociation. Except as
> otherwise provided in subsections (b) and
> (c),[1] the person shall not be liable for a
> limited partnership's obligation incurred
> after disocation.

In other words, a dissociated general partner remains liable for

obligations incurred by the limited partnership before that

partner left the partnership.

A dissociated general partner remains liable for
The issue raised by OCD is whether Oceanside's

obligation to indemnify AMICO is an obligation that Oceanside

---

[1]   Subsections (b) and (c) are irrelevant to this motion.   They
pertain to a dissociated partner's liability when the
dissociation results in dissolution of the partnership
(subsection (b)), and to transactions entered into after
dissociation (subsection (c)).

incurred before or after OCD dissociated from Oceanside on May 22, 2002.  OCD argues that the obligation to indemnify could not arise under the Bonds until Oceanside defaulted on its obligations and The Club and HCA completed the bonded improvements on the Hokuli'a project, thereby triggering AMICO's liability as a surety.  According to OCD, no such event occurred before May 22, 2002.  See Def.'s Memo. in Supp. of Motion for Summary Judgment ("Motion") at 24.

OCD reads the indemnity agreements as conditional contracts imposing no legal obligation until stated conditions occur.  OCD argues that the indemnity agreements set "loss" and "liability" as the conditions triggering liability.  According to OCD, AMICO did not suffer any loss before May 22, 2002, because AMICO paid no judgment under the Bonds, made no demand for indemnity, and incurred no liability as of that date; Oceanside had not breached its development agreements as of that date; and no party made a claim under the Bonds as of that date.  OCD argues that The Club and HCA must complete the bonded improvements and seek reimbursement from AMICO before AMICO has any obligation under the Bonds.

AMICO, on the other hand, argues that Oceanside became obligated to indemnify AMICO while OCD was still a general partner, as Oceanside executed the 2001 Indemnity Agreement on June 12, 2001.  According to AMICO, Oceanside's obligation to

18

indemnify AMICO arose when Oceanside agreed to the indemnity provision, and OCD remains liable to keep that promise.

Whether the indemnification agreement is an "obligation incurred" at the time the indemnification is signed is unclear. Hawaii's appellate courts have yet to issue a published opinion stating Hawaii law in this regard. Courts in some other states agree with OCD that an obligation to indemnify does not arise until the events that trigger indemnification occur. For instance, interpreting partnership laws similar to Hawaii's, the Supreme Court of Utah held that "the dispositive issue is whether the events out of which the [remaining partners'] lawsuits arose occurred before or after" a former partner dissociated. McKay v. Hardy, 973 P.2d 941, 945 (Utah 1998). The court declined to impose liability on a former general partner for expenses relating to lawsuits brought against the remaining partners after the former partner's dissociation, noting that the remaining partners did not produce "any evidence that would even remotely suggest" that the lawsuits arose out of the partnership business before dissociation. Id. at 946; see also Fox Valley Builders Corp. v. Day, 71 Wis. 2d 785, 790-91, 238 N.W.2d 748, 751-52 (1976) (holding that a former partner was jointly liable to a client that had been double-billed by a partnership because the double-billing occurred before the partner withdrew).

On the other hand, the Ninth Circuit has characterized an indemnity agreement as a "preexisting obligation." Inland

<u>Asphalt Co. v Comm'r of Internal Revenue</u>, 756 F.2d 1425, 1429 (9th Cir. 1985).  The Ninth Circuit, however, said that outside the context of partnership law.  The indemnity agreement in that case was issued by a corporation to a shareholder when the shareholder sold his shares to a third party.  <u>Id.</u> at 1427.  The indemnity agreement provided that the corporation would pay any tax deficiencies that the former shareholder might face in connection with certain corporate transactions.  <u>Id.</u>  When the corporation made good on the agreement, the IRS deemed the indemnification to be a constructive divided, even though it occurred after the shareholder sold his shares.  <u>Id.</u>

More analogous to the present case are cases involving loans or lease agreements.  Like loans and lease agreements, an indemnity agreement is a contract that requires a party to do something at a later time.  The United States District Court for the District of Massachusetts notes that an obligation incurred before dissociation "obviously includes obligations with respect to debts which have not yet matured." <u>Fedder v. McClennen</u>, 959 F. Supp. 28, 31, 35 (D. Mass 1996).  The court held a former general partner jointly and severally liable for loans made to a limited partnership before dissociation even though the loans did not mature until after dissociation.  <u>Id.</u>; <u>see also</u> <u>UBS Bank USA v. Wolstein Bus. Enter.</u>, No. 2:08-cv-0911 CW-SA, 2011 WL 129868, at *11 (D. Utah Jan 14, 2011) (holding a dissociated general partner jointly and severally liable for a loan the partnership

20

took out before dissociation, even though the loan matured after dissociation).

In 8182 Maryland Assoc. v. Sheehan, the Supreme Court of Missouri, stating that "withdrawing partners retain personal liability after withdrawal, even for contingent obligations," held a former partner personally liable on a lease agreement that the former law partner had personally signed, even though the partner withdrew from the partnership before the lease commenced or was breached.  14 S.W.3d 576, 581 (Mo. 2000).  The court stated:  "A party becomes liable on a contractual agreement, even a lease agreement with a future date of commencement, at the moment it is executed."  Id. at 582; see also Krasne v. Tedeschi and Grasso, 762 N.E.2d 841 (Mass. 2002) (holding that a former general partner of a law firm could be held liable for the partnership's unpaid rent); contra Oxford Mall Co. v. K&B Missouri Corp., 737 F. Supp. 962, 966 (S. D. Mo. 1990) (holding that a dissociated partner could not be held liable for breach of a lease agreement that had been executed before dissociation if the wrongful events occurred after dissociation).

AMICO argues that it issued the Bonds "based on the credit of the partnership and the confidence reposed in the ability of the partnership."  Pls. Memo. in Opp. to Def's Motion for Summary Judgment ("Opposition") at 21 (citing Briggs v. Briggs & Vose, 15 N.Y. 471, 475 (App. 1857)).  Therefore, AMICO says, the composition and credit of the partnership at that time

21

was highly relevant to it as a contracting party.  Id.  See

Dayton Securities Associates v. Securities Group 1980, 74 F.3d

1103, 1110 (11th Cir. 1996) (interpreting New York law as

protecting landlords who, in determining whether to lease their

properties, relied on the dissociated partners' obligations to

contribute money to satisfy recourse obligations under the

limited partnership certificate).  It cannot be disputed that

the Bonds and the indemnification agreements were transactions

for which confidence in the financial viability of the parties

was indeed significant.  See, e.g., Ground Improvement

Techniques, Inc. v. Merchants Bonding Co., 63 F. Supp.2d 1272,

1275 (D. Colo. 1999)("Suretyship is a credit transaction in which

a surety, in providing bonds on behalf of its principal, is

extending the surety's credit to the principal in order for the

principal to enter into a contract with an obligee. The surety

expects to incur no loss as a result of that extension of credit.

In the event that the surety incurs a loss, the surety expects to

be reimbursed for its loss by its principal and any third-party

indemnitors.") (citation omitted).

        While the court acknowledges the competing arguments as

to whether the indemnity agreements imposed obligations even

before any default occurred, the court need not resolve that

matter on this motion.  AMICO makes the additional argument that,

even if Oceanside's obligation to indemnify AMICO accrued after

OCD dissociated, there are genuine issues of material fact as to

22

whether Oceanside defaulted on its bond obligations while OCD was a general partner.  If it did, AMICO contends, OCD is liable for Oceanside's default.  The court agrees that there are genuine issues of material fact regarding this issue.  At the hearing on this motion, both parties agreed that, had OCD been a general partner when the events occurred that triggered Oceanside's obligation to indemnify AMICO, OCD could be held jointly and severally liable under at least one of the indemnification agreements.  According to OCD, no such events occurred.  In particular, OCD contends, Oceanside did not default on its bond obligations before OCD dissociated.  See Nakamura Decl. Ex. K, at 6-8, ECF No. 357-13; Nakamura Decl. Ex. L, at 4-7, ECF No. 357-14.

AMICO, however, points to completion dates specified in the Club Improvement Bond and the Phase I Bond that AMICO says Oceanside failed to meet.  In the Club Improvements Bond, Oceanside agreed to complete the Golf Course by October 2001, and the Golf Maintenance Facility by December 2001.  See Club Bond at 1.  As this court stated in an earlier order, there are genuine issues of material fact as to whether the Golf Course is "complete."  See Order Denying AMICO's Mot. for Partial Summary Judgment Regarding the Golf Course at 14, August 11, 2011, ECF. No. 360.  AMICO has also presented evidence suggesting that the Golf Maintenance Facility was not complete by its completion date.  See De Fries Depo. at 183:24 - 184:21.

23

In the Phase I Bond, Oceanside agreed to complete telephone, electrical, and utility ductline work by December 2001.  See Phase I Bond at 2.  AMICO has presented evidence suggesting that Oceanside did not complete this work before the December 2001 completion date.  See De Fries Depo. at 166:14-169:2.  There is no evidence that Oceanside and The Club agreed in writing to extend the completion dates, as required by the Bonds for any extension.  See Club Improvements Bond at 2; Phase I Bond at 2-3 (requiring that the obligee and principal agree to extensions in writing).

In addition, at the hearing on this motion, AMICO argued that there are issues of fact as to whether OCD's withdrawal from the partnership caused Oceanside to default on any bond obligations, and whether the parties intended that OCD serve as a direct obligor under the indemnity agreements, not merely as Oceanside's partner.  The court finds that summary judgment is precluded by genuine issues of material fact as to whether Oceanside defaulted on its bond obligations before OCD dissociated.  As an Oceanside default on bond obligations before OCD's dissociation would have indisputably given rise to OCD's obligation under at least one indemnity agreement, these factual questions prevent the court from granting summary judgment.

B.   AMICO's Claims Against OCD Are Not Time-Barred.

OCD also argues that AMICO's claims against OCD for Oceanside's breach of the 2001 Indemnity Agreement are barred by

the statue of limitations.  While the parties briefed the court on Hawaii law, AMICO noted at the hearing on this motion that California law controls, pursuant to the choice of law provision in the Indemnity Agreement.  See 2001 Indemnity Agreement at 4. OCD did not challenge this assertion at the hearing.  California has a four-year statute of limitations for breach of contract claims.  Cal. Civ. Proc. Code § 337.  As AMICO filed its complaint against OCD on May 12, 2011, AMICO's claims would be time-barred if they accrued before May 12, 2007.

Under California law, "statutes of limitation do not begin to run until a cause of action accrues. . . .  Generally speaking, a cause of action accrues at the time when the cause of action is complete with all of its elements." Fox v. Ethicon Endo-Surgery, Inc., 110 P.3d 914, 920 (Cal. 2005) (citations omitted).  In other words, the statute of limitations begins to run only when events have occurred that would allow the wronged party to bring a lawsuit.

OCD argues that the statute of limitations on AMICO's claims for any breach of the 2001 Indemnification Agreement began to accrue in 2003, when AMICO had knowledge of facts giving rise to Oceanside's liability to AMICO.  OCD claims that AMICO could have sued Oceanside based on that knowledge.  The court is not persuaded.  Even if AMICO knew that Oceanside had defaulted on the Development Agreements before May 12, 2007, default on the

Development Agreements is not automatically equivalent to default on the indemnity agreements.

OCD further argues that, if the court rules that Oceanside incurred its obligations under the indemnity agreements when they were executed, it must also rule that execution of the agreements triggered the statute of limitations.  The court, as noted above, has not ruled on whether Oceanside incurred obligations upon executing the agreements.  Moreover, the statute of limitation on AMICO's claims does not necessarily begin to run when Oceanside incurred its obligations.  AMICO's statute of limitations did not start to run until AMICO could make a claim against Oceanside for breaching one or more of the indemnity agreements.  OCD has not argued that AMICO had a cause of action under any indemnity agreement before May 2007.  On the present record, OCD does not establish that AMICO's claims are time-barred.

C.   There are Genuine Issues of Material Fact Regarding Whether AMICO Materially Altered the Nature of OCD's Obligation.

Lastly, OCD argues that, even assuming Oceanside incurred an obligation to AMICO under the indemnity agreements before OCD's dissociation, OCD's liability was extinguished when AMICO materially altered OCD's obligation.  Section 425E-607(e) of Hawaii Revised Statutes states that a dissociated general partner is released from liability when there is a nonconsensual material alteration to the dissociated partner's obligation:

> A person dissociated as a general partner
> shall be released from liability for an
> obligation of the limited partnership if the
> limited partnership's creditor, with notice
> of the person's dissociation as a general
> partner but without the person's consent,
> agrees to a material alteration in the nature
> of time or payment of the obligation.

The parties point the court to no case defining a "material alteration" in the context of an obligation arising under the Uniform Limited Partnership Act.  However, the concept of a "material alteration" has been the subject of contract cases.  Thus, for example, the Ninth Circuit notes that, under California law, whether a change is material depends on "whether or not the change works any alteration in the meaning or legal effect of the contract."  S. Cal. Edison Co., v. Hurley, 202 F.2d 257 (9th Cir. 1953) (citations omitted).  "[A] material alteration is one that works some change in the rights, interests, or obligations of the parties to the writing."  Id.; see also Bank of Moberly v. Meals, 316 Mo. 1158, 1167 (1927) ("A material alteration is one which so changes the terms of the instrument as to give it a different legal effect from that which it originally had, and thus works some change in the rights, interest, or obligations of the parties.").

According to OCD, AMICO agreed to two material alterations to Oceanside's obligation to AMICO: (1) AMICO allegedly continued to renew three of the Bonds after their estimated completion dates had passed without completion of the

27

work in issue; and (2) AMICO added Textron as a new dual obligee on the Bonds.

        1.    Whether AMICO Renewed the Bonds and
             Materially Altered OCD's Obligation.

OCD argues that AMICO renewed the Phase I, Phase II, and Club Improvements Bonds after OCD dissociated from Oceanside. It is undisputed that Oceanside did not meet many of the completion dates set forth in the Bonds.  According to OCD, after OCD dissociated, AMICO, knowing that Oceanside had not met certain deadlines, continued to renew or extend those Bonds and collect premiums without OCD's consent.  This, OCD argues, materially altered Oceanside's obligation under the indemnity agreements by increasing Oceanside's "amount and time of indemnification."  Motion at 31.

AMICO responds that it could not, acting alone, renew the Bonds, as any extension required the agreement of others, such as Oceanside, the Bonds' principal.  See, e.g., Phase I Bond, at 2-3.

Second, AMICO argues that, although the parties used the term "renewal" in the course of their dealings, the Bonds were not actually renewed because they did not expire.  The Bond invoices state that the Bonds were "continuous in nature." Squatrito Decl. Ex. 5, ECF No. 446-6.  In addition, a letter from AON Risk Services to Oceanside states: "If the bonds remain outstanding after two years, they will be renewed . . . annually

until the County of Hawaii exonerates the bond [sic]."   Squatrito Decl. Ex. 4, ECF No. 446-5.

Third, AMICO argues that, even assuming the Bonds were renewed by AMICO, it is unclear whether the alleged renewals materially altered OCD's obligation.   The 2001 Indemnity Agreement included "any renewals or extensions" of the Bonds, and any subsequent Bonds.  2001 Indemnity Agreement at 1.   Similarly, the 1999 Indemnity Agreement stated that it extended to "any renewals or continuations."  1999 Indemnity Agreement at 1.   If the indemnity agreements were continuous and expressly contemplated renewals, then a renewal of the Bonds would not have altered OCD's legal rights.   On the present record, there are genuine issues of material fact as to whether AMICO materially altered OCD's obligation by renewing the Bonds.

> 2.   Whether AMICO Materially Altered OCD's Obligation When it Added Textron as a New Dual Obligee to the Bonds.

In 2005, Deere was removed as a dual obligee of the Bonds, and on June 27, 2006, Textron was added as a new dual obligee.  Thus, there was a "gap" between Deere's removal and Textron's addition.   OCD argues that AMICO participated in adding Textron without OCD's consent, materially altering OCD's obligation under the Bonds given (1) the absence of any dual obligee on any of the Bonds at the time Textron became a dual obligee, meaning that Textron was not a substitute for any obligee; (2) Textron's addition as a dual obligee on nine Bonds,

while Deere had been a dual obligee on only three;[2] and (3) Textron's loan of $40 million to Oceanside when Textron became a dual obligee.  See Siwek Depo. at ¶ 49:24-50:2; Squatrito Decl. Exs. 7a-7c, ECF No. 446-8; Squatrito Decl. Exs. 8a-8i, ECF No. 446-9.  AMICO responds that adding Textron made no change to any bond obligation; Textron allegedly merely replaced Deere and provided financing functionally the same as Deere's financing services.  See Siwek Depo. at 59:20-22.  Further, at the hearing, AMICO argued that, regardless of the number of obligees or the amount of money loaned, the parties' obligations under the Bonds remained limited to the terms that the parties agreed to in the Bonds.

OCD cites Keesling v. TEK Partners, LLC, an Indiana Court of Appeals case addressing a dispute about a note that was replaced by a new note without the consent of some of the note's original signatories.  861 N.E.2d 1246, 1253 (Ind. Ct. App. 2007).  The second note increased the principal balance from $300,000 to $362,000.  Id.  The court held that parties that had not consented to a change were not bound by the change because "a guaranty of a particular debt does not extend to other indebtness not within the manifestation of the parties."  Id. at 1254.

---

[2] In its reply, OCD states that Deere was a dual obligee on three Bonds.  Def.'s Reply to Pls. Opp. to Def.'s Mot. for Summary Judgment at 18, ECF No. 484.  AMICO's exhibits, however, indicate that Deere was a dual obligee on four Bonds.  See Squatrito Decl. Exs. 6a-d, ECF No. 446-7.  This inconsistency does not affect the court's decision.

<u>Keesling</u> is inapposite.  In <u>Keesling</u>, the four corners of the note did not allow the principal balance to exceed $300,000.  <u>Id.</u> In the present case, the court is unable to determine whether the addition of another dual obligee was contemplated by the parties, or whether or how the addition of Textron affected OCD.  The court is left with genuine issues of material fact as to whether the addition of Textron materially altered any of OCD's obligations.

V.      <u>CONCLUSION.</u>

        Given the multiple issues of fact, the court DENIES OCD's motion for summary judgment.


        IT IS SO ORDERED.

        DATED: Honolulu, Hawaii, October 27, 2011.




                    /s/ Susan Oki Mollway
                    Susan Oki Mollway
                    Chief United States District Judge


<u>AMICO v. The Club at Hokuli`a</u>; Civil No. 10-00199 SOM/KSC; ORDER DENYING OCD, LLC'S MOTION FOR SUMMARY JUDGMENT